1   Paul Hoffman, SBN 071244
    SCHONBRUN SEPLOW
2   HARRIS & HOFFMAN LLP
    200 Pier Avenue #226
3   Hermosa Beach, California 90254
    Telephone: (310) 396-0731
4   Fax: (310) 399-7040

5   CENTER FOR JUSTICE & ACCOUNTABILITY
    Nushin Sarkarati
6   nsarkarati@cja.org
    Carmen Cheung (pro hac vice pending)
7   ccheung@cja.org
    One Hallidie Plaza, Suite 406
8   San Francisco, CA 94102
    (415) 544-0444 (telephone)
9

10  Attorneys for Plaintiff
    AHIMSA WICKREMATUNGE

11

12

13              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
14

15  AHIMSA WICKREMATUNGE, in her          )    Case No.  CV19-2577-R(RAOx)
    individual capacity and in her capacity as )
16  the legal representative of the Estate of  )    **COMPLAINT FOR DAMAGES**
    LASANTHA WICKREMATUNGE;                )
17                                         )
                                           )
18                          Plaintiff      )
                                           )    **DEMAND FOR JURY TRIAL**
19             v.                          )
                                           )
20  Nandasena Gotabaya Rajapaksa,          )
                                           )
21                          Defendant.     )
                                           )
22  _____       )
                                           )
23                                         )

24

25

26  Plaintiff Ahimsa Wickrematunge, in her individual capacity, and in her capacity as

27  the legal representative of the estate of Lasantha Wickrematunge, complains and

28  alleges as follows:

**PRELIMINARY STATEMENT**

1      This case arises from the brutal killing and persecution of journalists by the government and security forces of Sri Lanka. On the morning of January 8, 2009, Lasantha Wickrematunge ("Decedent", or "Lasantha"), editor of *The Sunday Leader* newspaper and outspoken critic of the corruption and human rights abuses of the Sri Lankan government under President Mahinda Rajapaksa, was assassinated in the Sri Lankan capital of Colombo. This action alleges that Nandasena Gotabaya Rajapaksa ("Defendant"), a United States citizen and Sri Lanka's then Secretary of Defense, instigated and authorized the extrajudicial killing of Lasantha; had command responsibility over those who executed the assassination; and incited, conspired with, or aided and abetted subordinates in the Sri Lankan security forces and military intelligence, or groups acting in coordination with these units, to engage in a widespread and systematic targeting of journalists and media workers who were perceived to be critical of the government, including the extrajudicial killing and persecution of Decedent on political grounds.

2      On numerous occasions, Lasantha and his newspaper exposed allegations of corruption and abuses by the Defendant in his capacity as Secretary of Defense. Lasantha's reporting, which was widely followed in Sri Lanka, led to

Defendant's targeted attempts to silence him. Defendant ordered Lasantha's arrest and filed a defamation suit against him. Intelligence services under the Defendant's command began surveilling Lasantha's mobile telephone. Immediately before he was due to testify against Defendant regarding an alleged corruption scandal, Lasantha was brutally murdered in broad daylight by members of the Tripoli Platoon, a unit of Sri Lanka's Directorate of Military Intelligence operating under Defendant's command.

3     Following the assassination, Defendant and his allies obstructed Plaintiff's efforts to seek justice in Sri Lanka by tampering with witnesses and engaging in a pattern of coercion and intimidation.

4     The acts alleged herein were carried out in the context of a systematic crackdown against journalists critical of the government. Lasantha's death was one of many attacks against journalists perpetrated under the Rajapaksa regime. Security forces under Defendant's command and control engaged in a widespread and/or systematic campaign against journalists, marked by a pattern and practice of violations including but not limited to extrajudicial killing; arbitrary detention; torture; and cruel, inhuman and degrading treatment in an effort to stamp out criticism of the Rajapaksa government.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5      On information and belief, Defendant is a citizen of the United States and Sri Lanka and is a former resident of Los Angeles, California.

6      Plaintiff seeks compensatory and punitive damages and declaratory and injunctive relief for torts in violation of international and domestic law.

**JURISDICTION AND VENUE**

7      This Court has jurisdiction over Plaintiff's claims of extrajudicial killing under 28 U.S.C. § 1331, as this action arises under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note).

8      This Court has jurisdiction over Plaintiff's claims for extrajudicial killing and crimes against humanity as torts in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350.

9      Defendant is a U.S. citizen and resident of Sri Lanka. Defendant was served in Los Angeles, California. Venue is proper in the Western Division of the Central District of California pursuant to 28 U.S.C. § 1391(b)(3) and (c)(3).

PARTIES

### *Defendant Nandasena Gotabaya Rajapaksa*

10     On information and belief, Defendant Nandasena Gotabaya Rajapaksa was born on June 20, 1949 in Sri Lanka. Defendant immigrated to the United States in the early 1990s and became a U.S. citizen in 2003.

11     Defendant returned to Sri Lanka in 2005 and was appointed by his elder brother, then President of Sri Lanka Mahinda Rajapaksa, as Secretary to the Sri Lankan Cabinet Ministry of Defence, Public Security, Law and Order (hereinafter "Secretary of Defense"). This position placed him in overall command of Sri Lanka's armed forces, intelligence services, and police force. Defendant served as Secretary of Defense from November 2005 to January 2015. Defendant continues to travel frequently to California.

### *Decedent Lasantha Wickrematunge*

12     Lasantha Wickrematunge ("Decedent") was an acclaimed journalist in Sri Lanka, famous for his political opinion columns and his investigations exposing

state corruption and brutality. Lasantha was editor-in-chief of *The Sunday Leader*, an English-language weekly newspaper known for being one of the few media outlets in Sri Lanka reporting on human rights violations and war crimes being committed by both sides in Sri Lanka's decades-long civil war. In recognition of his commitment to a free and independent press, even in times of armed conflict, Lasantha was posthumously awarded the UNESCO World Press Freedom Prize, the Louis Lyons Award for Conscience and Integrity in Journalism by Harvard University's Nieman Foundation, the James Cameron Memorial Trust Award, and the National Press Club's International Freedom of the Press Award, and he was declared the World Press Freedom Hero by the International Press Institute in 2010. His funeral drew mourners from around the country and the world. Statements condemning his assassination were issued by the United States, the United Kingdom, Australia, Canada, the European Union and the United Nations.

### Plaintiff Ahimsa Wickrematunge

13    Plaintiff Ahimsa Wickrematunge is the daughter of Lasantha Wickrematunge. In 2002, Ahimsa and her siblings moved to Australia due to ongoing threats of violence against their family in Sri Lanka arising from Lasantha's publications in *The Sunday Leader*. Ahimsa returned to Sri Lanka when she was

sixteen and was living with Lasantha in Colombo when he was killed. She has been

pursuing justice for her father's killing for the past ten years. Plaintiff is a citizen and

resident of Australia. She brings this action for extrajudicial killing and crimes

against humanity in her individual capacity and in her capacity as personal

representative of her father's estate.

## BACKGROUND

14   Lasantha's death occurred in the final months of Sri Lanka's decades-

long civil war between the Government of Sri Lanka (GSL) and the Liberation Tigers

of Tamil Eelam (LTTE). The war lasted from 1983 to 2002, when the GSL and the

LTTE agreed to a ceasefire. However, the two sides again turned to violence in 2006.

In May 2009, the GSL defeated the LTTE, amidst allegations of international law

violations committed by the GSL and LTTE during the final months of the war.

15   In March 2011, a Panel of Experts commissioned by the U.N. Secretary

General ("U.N. Panel") released a report documenting international law violations by

the Sri Lankan government and LTTE. The report found credible sources showing

that as many as 40,000 civilians died in the final stages of the war and concluded that

these casualties, if proven, calls for criminal liability for army commanders, senior

government officials, and LTTE leaders. As Secretary of Defense from November 2005 to January 2015, Gotabaya was a chief architect of this violent campaign.

16     Mahinda Rajapaksa served as Sri Lanka's President from November 2005 to January 2015, and presided over the conclusion of the civil war. His regime participated in three major campaigns during this period: the destruction of Tamil separatism, the liquidation of media critics and political opponents, and the enrichment of the Rajapaksa family's inner circle through corruption.

17     To ensure a cohesive political and military leadership, President Mahinda Rajapaksa appointed his brother, Defendant Gotabaya Rajapaksa, as his Secretary of Defense. The Rajapaksas further consolidated power by appointing Mahinda's brother, Basil Rajapaksa, first as his senior presidential advisor, and later as the Minister of Economic Development. Another brother, Chamal Rajapaksa, held the position of Speaker of Parliament.

### *Defendant's Role as Secretary of Defense and Consolidation of Intelligence Agencies*

18     Defendant served as Secretary of Defense from 2005 to 2015. The Secretary of Defense is the most senior civil servant in the Ministry of Defense, which houses all branches of the Sri Lankan security forces. This includes the three

branches of the Sri Lankan military: the Sri Lanka Army (SLA), the Sri Lanka Navy (SLN) and the Sri Lanka Air Force (SLAF). It also includes three civilian bodies: the Sri Lanka Police (SLP), the National Intelligence Bureau (NIB) (currently known as the State Intelligence Service (SIS)), and the Civil Defense Forces (CDF). All six branches were part of the Ministry of Defense until 2013.

19    As Secretary of Defense, Defendant consolidated control over all of Sri Lanka's military and civilian intelligence agencies by cementing the position of Chief of National Intelligence. The Chief of National Intelligence served as a direct line of authority between the Secretary of Defense and all of the intelligence units within the Ministry of Defense, including the SLA's Directorate of Military Intelligence.

20    The Secretary of Defense played a key role in coordinating operations between the different agencies within the Ministry of Defense and Defendant played a particularly hands-on role with respect to working with the intelligence services. In media interviews published in April 2009, the Inspector General of the SLP and the Deputy Inspector General of the Criminal Investigation Department ("CID") described weekly meetings of the different intelligence services held by the Secretary of Defense. Interviews with senior officials, including Defendant and his Chief of National Intelligence Kapila Hendawitharana, described the weekly meetings as a

way to share intelligence between the agencies, discuss incidents and investigations, and address security concerns outside the main conflict zone in northern Sri Lanka. Defendant reportedly "went down to the nuts and bolts of security issues" and made "spot decisions on issues raised by the representatives of the various intelligence agencies."

21     In addition, the Secretary of Defense had the power to direct investigations involving "national security" and "terrorism," which was expansively applied to investigate media workers, humanitarian aid workers, human rights activists, and individuals perceived to be "Tiger sympathizers" (individuals deemed sympathetic to the LTTE movement). Sri Lanka's 2005 Emergency Regulations of the Public Security Ordinance also granted the Secretary of Defense broad authority to order arrests and detention if he "is of opinion" that the arrest is necessary in the interest of national security or the maintenance of public order.

22     In carrying out its national security mandate, the different agencies of the Ministry of Defense acted with a high degree of coordination, engaging in joint intelligence activities and information sharing, as well as joint planning. Units from both military and civilian security forces worked in concert to carry out arrests linked to "national security."

*Rajapaksa Regime and Its Widespread and Systematic Attacks on Journalists*

23     The Rajapaksa regime was sensitive to criticism of its war effort and allegations of corruption. As a result, it also launched an assault on the free press, routinely harassing journalists, editors, and other individuals associated with the press. Although the Rajapaksa regime frequently denied playing any role in the attacks against journalists – which ranged from veiled threats to abductions, assaults, torture, and killings – many attacks were traced back to government security forces. The Rajapaksa regime also arrested, deported, and sued journalists, and attempted to enact laws and regulations limiting free press.

24     In response to this assault on the media, many journalists fled, and independent media outlets shut down. Several independent journalists who remained active in the country and did not exercise "self-censorship" were targeted for attack. During the 10-year rule of the Rajapaksa family, at least 17 journalists and media workers were killed, and many others were threatened, assaulted, or abducted. Press freedom organizations such as the Committee to Protect Journalists and Reporters Without Borders documented serious threats to media workers throughout the Rajapaksa regime.

25     After the end of the war, a United Nations human rights investigative body examined allegations of serious violations and abuses of human rights committed by both parties in the Sri Lankan civil war from 2002 to 2011. The investigation concluded that the attacks against journalists were widespread and occurred over an extended period of time; they also appeared to be systematic in targeting media known to be critical of government policies and officials.

26     The Ministry of Defense played a key role in this crackdown on independent journalism. Joint security forces and military intelligence units identified and targeted journalists alleged to pose a threat to national security. Journalists branded as "Tiger sympathizers" would have their names posted on the Ministry of Defense website, and journalists critical of the Rajapaksa regime would find themselves subject to arrest or attack by government security forces.

27     The Directorate of Military Intelligence – which was part of the inter-agency intelligence group that met weekly with Defendant – also operated a clandestine unit known as the "Tripoli Platoon," which was comprised of elite commandos and members of the Special Forces. The Tripoli Platoon was directly under the control of the Ministry of Defense and was tasked with surveillance of and attacks on journalists who engaged in independent (and sometimes negative)

reporting on the Ministry of Defense, Defendant, or the Rajapaksa regime. According to court filings made by the CID, the Tripoli Platoon has been linked to at least three attacks on journalists, including Lasantha's assassination, and the abduction and torture of newspaper editors Keith Noyahr and Upali Tennakoon.

28     In 2008, Keith Noyahr, deputy editor of *The Nation*, was kidnapped outside of his home by unidentified men and taken away in a white van. He was taken to a military intelligence safe house, where he was stripped, suspended in mid-air, and beaten. During this attack he was questioned as to the sources of his news articles. In his search for Noyahr, *The Nation*'s CEO, Krishantha Cooray, called Cabinet Minister Karu Jayasuriya for assistance, who in turn called President Mahinda Rajapaksa. Jayasuriya threatened to publicly resign from the government along with several other cabinet colleagues if Noyahr was not released. Noyahr was finally released after a series of telephone calls down the chain of command from the Secretary of Defense to the Tripoli Platoon. Noyahr and his family subsequently received death threats and fled the country, ending his reporting in Sri Lanka.

29     In 2009, Upali Tennakoon, editor of the newspaper *Rivira*, was driving to his office when four men on motorcycles stopped him, smashed in his car windows, and proceeded to beat him and his wife with metal bars. Following the

attack, Tennakoon's wife received telephone calls threatening that Tennakoon would be killed if he continued to work as a journalist. Mobile telephone records reported to Sri Lankan courts establish that Tennakoon was under surveillance by the Tripoli Platoon. Tennakoon identified a senior officer of the Directorate of Military Intelligence in a lineup. Soon after the identification, Tennakoon was forced to flee the country following threats to his safety.

30     Other examples of attacks on journalists followed a similar pattern: journalists critical of the government would be publicly identified and threatened by the Rajapaska regime, and would be subsequently abducted, beaten, or killed. On January 24, 2006, journalist Subramaniyam Sugitharajah was shot and killed on his way to work. His murder occurred just weeks after he had published photos of five Tamil students who had been murdered execution-style by the police, contradicting the government's claims that the students had been killed by a self-detonated grenade. On March 7, 2008, a columnist for *The Sunday Times*, J.S. Tissainayagam, was arrested by the Sri Lanka Police's Terrorist Investigation Division and sentenced under the Terrorism Act to 20 years of hard labor for articles he wrote in 2006 criticizing the military's treatment of Tamil civilians in northeastern Sri Lanka. On June 1, 2009, Poddala Jayantha, a journalist at *Mihira* newspaper, was abducted by

men in a white van and severely beaten. Defendant had personally threatened Jayantha in 2008 after he participated in a free media demonstration, telling him that criticism of the military leadership would not be tolerated and that if he and his colleagues persisted in their criticism of the government, "people who know how to do it will finish you off." Several days prior to the attack, a government-run television station had published photos of Poddala and other journalists, while the Inspector General of Police referred to them as traitors. On January 24, 2010, just two days before the 2010 election, political cartoonist and journalist Prageeth Eknaligoda disappeared after leaving his office in the evening. Eknaligoda had been investigating Defendant and had published a "family tree" of the dozens of Defendant's relatives that held government office, and publicly supported the campaign of the opposition candidate Sarath Fonseka.

31     While Lasantha's assassination on a crowded street in Colombo was one of the most prominent and visible attacks on independent journalism carried out under the Rajapaksa regime, it was part of a larger pattern of intimidation, persecution, and violence.

***Lasantha's Corruption Investigation and Threats Preceding the Assassination***

32      *The Sunday Leader* newspaper was an English-language weekly publication that was printed from 1994 to 2017 in Sri Lanka. Lasantha founded the paper and served as editor-in-chief from 1994 until his death in 2009.

33      In 2006, Lasantha's reporting brought him on a collision course with the Defendant. On December 24, 2006, the front-page headline of *The Sunday Leader* read "President to get Rs. 400 million luxury bunker."  Under this headline, the newspaper detailed an approximately US $4 million government construction project to create a bunker for the Sri Lankan elite. Lasantha's accompanying editorial criticized the creation of a Rajapaksa "dynasty". Shortly after publication, Defendant ordered police officers in the CID to arrest Lasantha against their objections, overriding the legal advice of the Solicitor General of Sri Lanka. The Secretary to the President revoked the order minutes before it was to be executed.

34      Between July and September 2007, *The Sunday Leader* published a series of articles alleging that Defendant was involved in embezzling millions of dollars in a 2006 contract to purchase MiG fighter jets from Ukraine. The reporting exposed financial and procedural irregularities in the 2006 procurement of aviation equipment and services by the Sri Lanka Air Force from the Government of Ukraine,

identifying Defendant as overseeing the transaction and alleging potential corruption in the procurement process led by Defendant. The reporting also indicated that the transactions went through a U.S. bank, raising the allegation that the proceeds of the crime were being laundered through the U.S. financial system.

35     Following the publication of these articles, Defendant stated in an interview that the media had freedom in Sri Lanka because "you can tell lies and criticize the President, the Defence Secretary and Minister, and after writing these things, and you can get into your car and drive around by yourself" while gesturing as if holding a steering wheel. It was well known that Lasantha was the only prominent government critic who drove his own vehicle without chauffeurs or security personnel. In October 2007, Defendant threatened to bring a defamation case against *The Sunday Leader* and the Wickrematunge brothers for their reporting on the "MiG Deal."

36     On November 21, 2007, black-clad commandos bearing automatic weapons stormed the premises of the printing press of *The Sunday Leader*, held staff at gunpoint, and set the printing press machinery on fire. This arson attack was never investigated by police, who at that time were under the direct control of Defendant.

37    In October 2008, President Mahinda Rajapaksa called Lasantha a "terrorist journalist" during an interview with Reporters Without Borders.

38    On or before September 2008, a few months before Lasantha's assassination, the State Intelligence Service, which was overseen by Defendant, began surveilling Lasantha's mobile phone for reasons of "national security."

39    In November 2008, Defendant filed a defamation action against Lasantha and *The Sunday Leader* for its reporting on the "MiG Deal," demanding 1 billion rupees (approximately US $10 million) in damages. Lasantha was scheduled to testify in this lawsuit shortly after he was killed.

40    In the weeks before his death, Lasantha continued to receive threats: on separate occasions he received a funeral wreath and a newspaper dipped in red paint with the words "If you write, you will be killed."  In the days before his death, Lasantha told his family that he was worried that he was being followed.

41    Two days before Lasantha's murder, Maharaja Television, an independent station, was stormed by black-clad commandos armed with automatic weapons, grenades, and claymore mines. Such weapons could only be lawfully obtained and used in Sri Lanka by the armed forces, which were under the direct command of Defendant. Lasantha had been working at Maharaja Television as a

presenter on a weekly current affairs program. Lasantha made his final television appearance in the immediate aftermath of the attack, on the early morning of January 6, 2009, urging viewers in English and Sinhala to remain resolute and unbowed in the face of government attempts to silence the media.

### *Assassination of Lasantha Wickrematunge*

42   On the morning of January 8, 2009, Lasantha Wickrematunge noticed black-clad men on motorcycles circling around his home in the suburbs of the Sri Lankan capital Colombo. He made several phone calls to friends and family indicating that he believed he was being followed.

43   As Lasantha drove to work that morning, he was swarmed by black-clad plainclothes commandos on motorcycles at a busy intersection in an area secured by military checkpoints. As cell phone tower logs would later show, this group of riders were part of, or worked in concert with, the Directorate of Military Intelligence's Tripoli Platoon, and this team had been following Lasantha for several weeks. The masked riders smashed the car's windows and one of the assassins punched a hole in Lasantha's skull with a sharp instrument. The motorcyclists sped off in the direction of a nearby military checkpoint. The motorcyclists entered a "High Security Zone"

policed by the Sri Lanka Air Force, leaving Lasantha gravely wounded. Onlookers quickly rushed Lasantha to Colombo South Teaching Hospital. Lasantha underwent emergency surgery but died several hours later.

44      Three days after Lasantha's death, *The Sunday Leader* published an editorial left on file by Lasantha in the event of his death. Reprinted around the world, Lasantha's "Letter from the grave" became an infamous broadside against the Rajapaksas:

> Terror, whether perpetrated by terrorists or the state, has become the order of the day. Indeed, murder has become the primary tool whereby the state seeks to control the organs of liberty. Today it is the journalists, tomorrow it will be the judges. For neither group have the risks ever been higher or the stakes lower.
>
> …
> It is well known that I was on two occasions brutally assaulted, while on another my house was sprayed with machine-gun fire. Despite the government's sanctimonious assurances, there was never a serious police inquiry into the perpetrators of these attacks, and the attackers were never apprehended.
>
> In all these cases, I have reason to believe the attacks were inspired by the government. When finally I am killed, it will be the government that kills me.
>
> In the wake of my death I know you [President Mahinda Rajapaksa] will make all the usual sanctimonious noises and call upon the police to hold a swift and thorough inquiry.
>
> But like all the inquiries you have ordered in the past, nothing will come of this one, too. For truth be told, we both know who will be behind my

death, but dare not call his name. Not just my life but yours too depends on it.

…

I hope my assassination will be seen not as a defeat of freedom but an inspiration for those who survive to step up their efforts. Indeed, I hope that it will help galvanise forces that will usher in a new era of human liberty in our beloved motherland. I also hope it will open the eyes of your President to the fact that however many are slaughtered in the name of patriotism, the human spirit will endure and flourish. Not all the Rajapaksas combined can kill that.

### *No Credible Investigation into Lasantha's Killing*

45    In the immediate aftermath of Lasantha's murder, Sri Lankan law enforcement agencies – under the control of Defendant – either failed to conduct a credible investigation into the killing, or actively interfered with any attempts to conduct a credible investigation.

46    First, a falsified autopsy report was issued by the Judicial Medical Officer indicating that Lasantha's death was caused by a firearm, even though this was inconsistent with the evidence at the crime scene and the report of the surgeon who conducted the emergency operation. Second, Lasantha's notebook, in which he had scrawled two license plate numbers on the day of the attack, was collected by police officers at the scene of the crime. This notebook was later discovered to have been tampered with, and the pages with the license plate numbers torn out and replaced with doctored entries.

47      Shortly after Lasantha's murder, Defendant sat for a television interview with the British Broadcasting Corporation (BBC), in which he was questioned about the assassination. At the time, Defendant was in charge of civilian law enforcement in Sri Lanka, including the police force tasked with investigating homicides. During this interview, Defendant stated that the killing of Lasantha was "just another murder," insisting that he was "not concerned about that." He asked the interviewer "why are you so worried about one man."

48      No further inquiries took place in Sri Lanka into Lasantha's murder until Plaintiff's attorneys and other family members successfully petitioned the Mount Lavinia Magistrates Court to order that investigations into the murder be conducted by the CID of the Sri Lanka Police, in December 2009.

49      However, when CID investigators sought to question a member of the Tripoli Platoon, the CID was ordered to halt its investigation and hand the case over to the Terrorist Investigation Division ("TID"), a detachment of the Sri Lanka Police. At the same time, Defendant issued a letter to the Sri Lankan Ministry of Foreign Affairs, instructing that the commanding officer of the Tripoli Platoon be assigned to a non-vacant diplomatic position at the Sri Lankan Embassy in Bangkok, Thailand,

1
2
3

within thirteen days. The letter instructed that the officer who was then present in Thailand be recalled.

4
5
6
7
8
9
10
11
12
13
14

50      After the TID took over the investigation, it halted all inquiries into the involvement of the Tripoli Platoon. In February 2010, the TID arrested seventeen other Military Intelligence officers attached to a different platoon, and detained them on suspicion of the murder of Lasantha and other abductions and assaults on journalists. However, all seventeen individuals were released from custody before being presented to witnesses for lineup identification. No charges were ever filed against any of the seventeen individuals.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

51      In February 2010, the TID took into custody the member of the Tripoli Platoon who had originally been sought for questioning by the CID. While in custody, however, this suspect was granted a promotion by the military and continued to receive his pay in violation of regulations governing military personnel in police custody. He was eventually released without being charged and without thorough questioning. No further investigations into the murder of Lasantha were conducted until 2015, when President Mahinda Rajapaksa was defeated in a general election and Defendant was forced to leave public office. Shortly thereafter, the Sri Lanka Police

re-activated its investigation into Lasantha's killing, re-assigning the investigation to the CID.

52      Following the presidential election of 2015, the government of President Maithripala Sirisena announced an ambitious transitional justice plan that included calls for criminal accountability for human rights abuses committed during the Rajapaksa regime. However, the Rajapaksa family has continued to assert influence over the new administration. In the past year, President Sirisena has publicly criticized ongoing investigations into abuses committed by military officers and Defendant during the Rajapaksa regime. Furthermore, on October 26, 2018 President Sirisena dismissed the sitting Prime Minister and appointed Mahinda Rajapaksa as the new Prime Minister, creating political turmoil and prompting international outcry. Shortly afterwards, President Sirisena sought to transfer Nishantha Silva, the main CID officer investigating Lasantha's case and other related cases, to a different department. This political situation has made it difficult for witnesses to come forward. Due to these political pressures, threats to witnesses, and continued state interference with the investigation the criminal investigations into Lasantha's killing and other attacks on journalists have stalled.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GENERAL ALLEGATIONS

53      On information and belief, Plaintiff alleges the following:

54      Defendant, in his capacity as Secretary of Defense, exercised command responsibility over, conspired with, aided and abetted, and/or incited individuals in the Tripoli Platoon, or groups acting in coordination with this unit, to perpetrate the extrajudicial killing of Decedent, whom Defendant viewed as a threat because of his reporting. Cell phone records establish that members of the Directorate of Military Intelligence division known as the "Tripoli Platoon" were involved in the direct perpetration of the attack against Decedent Lasantha Wickrematunge and that they benefited from the assistance of the Sri Lankan security forces to escape the scene of the crime. Defendant and individuals under his command then worked to prevent an effective investigation into Decedent's killing.

55      Defendant exercised command responsibility over the Tripoli Platoon, which carried out the murder of Decedent as well as attacks against journalists perceived as critical of the Rajapaksa government. The Tripoli Platoon operated under the command of the Chief of National Intelligence, who reported directly to the Defendant, the Secretary of Defense during the relevant time period. Defendant

Gotabaya engaged in weekly meetings and closely coordinated with the Directorate of Military Intelligence. Due to this relationship, Defendant knew or should have known about the attack on Lasantha. Furthermore, widespread media coverage of the attack, and of the allegations of security forces involvement, was enough to give Defendant knowledge of the murder after the fact. As the commander of both the armed forces and the police, Defendant had a duty to ensure an effective investigation and to punish those responsible for Lasantha's murder. Rather, the investigation during Defendant's tenure as Secretary of Defense was marked by interference and cover-ups by the investigating authorities, including actions taken by Defendant to actively interfere with any attempt to conduct a credible investigation.

56      Defendant also conspired with individuals in the military and police to carry out the attack on Lasantha and prevent an effective investigation. Defendant conspired with one or more members of the Directorate of Military Intelligence pursuant to a common plan, design, or scheme to carry out attacks against journalists who were critical of the Rajapaksa government, including the attack against Lasantha. Additionally, Defendant conspired with one or more members of the Sri Lanka Police to ensure that the military officers would not be implicated in Lasantha's murder. In addition to the attack itself, overt acts taken in furtherance of this conspiracy include

tampering with Lasantha's notebook, the order to transfer the investigation from the CID to the TID after a member of the Tripoli Platoon was implicated in the murder, and the order by Defendant to transfer one of the Tripoli Platoon suspects in Lasantha's case to a post at the Sri Lankan Embassy in Bangkok, Thailand, preventing a thorough investigation of the crimes. In addition to being personally liable for his own actions, Defendant is jointly and severally liable for the actions of his co-conspirators, all of which were actions undertaken in furtherance of a common plan, design, or scheme to threaten and eliminate journalists and silence critics of the government.

57     Defendant also contributed to the commission of the unlawful acts alleged herein by a joint criminal enterprise comprised of Defendant and his subordinates in the Ministry of Defense, specifically the Directorate of Military Intelligence and the Sri Lanka Police. Defendant and the co-participants entered into a joint criminal enterprise with a common plan or purpose of waging a widespread and systematic campaign to silence and violently repress journalists who were critical of the Rajapaksa government. Defendant and his co-participants committed the wrongful acts alleged herein in furtherance of this common plan or purpose. Defendant provided substantial assistance to the common plan by publicly targeting

journalists critical of the government with inflammatory labels and threats, ordering surveillance of journalists, using security forces under his direct command to attack journalists, including the Decedent, and facilitating impunity for these attacks. Defendant and his subordinates in the Ministry of Defense contributed to this joint criminal enterprise at each stage. Defendant also made a substantial contribution to the joint criminal enterprise by participating in the cover-up of the crimes alleged, ensuring that the perpetrators would not be held accountable. This contribution was intentional and made with knowledge of the shared purpose of the group to silence and repress critics.

58    Defendant is also responsible by virtue of having aided and abetted, or otherwise substantially assisted in the commission of the crimes against Lasantha, including through his role in Lasantha's killing by his subordinates and by then covering up the crimes and obstructing an effective investigation into the murder. Defendant was in command of the law enforcement agencies investigating Lasantha's murder and took actions to stall the investigation and ensure that Directorate of Military Intelligence officials were not implicated in the crimes. At all relevant times, Defendant knew and purposefully intended that his actions would aid, abet, or assist in the commission and cover-up of the murder. Defendant is therefore jointly and

severally liable for the wrongful conduct of the persons whom he aided and abetted.

59     Defendant is further liable for inciting the direct perpetrators of the attack against Lasantha. As described in paragraphs 21 to 26, and 32 to 41, the acts were carried out by Defendant's subordinates in the Ministry of Defense. Defendant encouraged the commission of the attack through veiled threats and public statements suggesting that perpetrators of crimes against journalists would not be held accountable. Defendant made numerous public comments denouncing journalists who criticized the Rajapaksa government as traitors. Defendant's brother specifically labeled Lasantha as a "terrorist journalist." A statement issued by the Ministry of Defense on May 31, 2008 called on "all members of the armed forces to unite and guard against these treacherous media campaign [sic] against them," naming *The Sunday Leader* as one of the "treacherous media." Another statement released by the Ministry of Defense on June 4, 2008 referred to journalists as "enemies of the state" who "are doing a job of the enemy." The Defendant personally authorized the release of these statements, and, given the pattern of attacks against journalists, was aware of the substantial likelihood of harm in transmitting these inflammatory messages. None of the perpetrators of the targeted attacks against journalists have been prosecuted or subject to military sanction to date.

60     The domestic investigation of Lasantha's death has been unduly prolonged and subject to government interference. As described in paragraphs 45 to 52, the investigation into Lasantha's murder has been subject to significant interference and obstruction. While his murder occurred over ten years ago, no criminal prosecutions have proceeded against those responsible. Despite advances made after the 2015 presidential election, the investigation has once again stalled in the current political climate, as described in paragraph 52.

## FIRST CLAIM FOR RELIEF

### *(Extrajudicial Killing of Lasantha Wickrematunge)*

61     Plaintiff Ahimsa Wickrematunge, in her individual capacity and as the legal representative of the estate of Lasantha Wickrematunge, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 to 60 as if fully set forth herein.

62     On January 8, 2009, Decedent Lasantha Wickrematunge was assassinated in his car while driving to work. The assailants were members of the Sri Lanka Directorate of Military Intelligence and/or individuals working with the security forces of Sri Lanka during the period in which Defendant was Secretary of Defense.

63     The killing of Lasantha Wickrematunge constitutes extrajudicial killing in violation of the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note).

64     In addition, the killing constitutes a "tort . . . committed in violation of the law of nations or a Treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that it was committed in violation of customary international law prohibiting extrajudicial killing, as widely expressed, clearly defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

65     The assassination was committed by or in concert with members of the Directorate of Military Intelligence or the security forces of Sri Lanka and was thereby committed under actual or apparent authority, or color of law, of the government of Sri Lanka.

66     The extrajudicial killing of Decedent was not authorized by any court judgment, and was unlawful under the laws of Sri Lanka, international law, and under the laws of any foreign nation. Decedent was unarmed and did not pose a real or apparent threat to persons or property that would have justified the use of deadly force against him.

67     As detailed in paragraphs 18 to 22, and 54 to 59, Defendant exercised command responsibility over, conspired with, aided and abetted, directed and/or incited individuals in the Sri Lankan security forces and Directorate of Military Intelligence, or groups acting in coordination with these units, to perpetrate the extrajudicial killing of Decedent.

68     As Secretary of Defense, Defendant possessed the legal authority and practical ability to exert control over the individuals who carried out the attack. Following the highly publicized killing, and the widespread allegations of military involvement, Defendant knew, or reasonably should have known, about the actions of his subordinates, but failed to take necessary and reasonable measures to punish them.

69     Prior to his death, Decedent underwent painful emergency surgery as a result of the puncture in his skull. As a result, Decedent suffered severe physical abuse and agony before succumbing to his injuries. Plaintiff, as the daughter of Decedent and representative of Decedent's estate, has standing to bring suit in her individual capacity and on behalf of her deceased father. The extrajudicial killing of Decedent Lasantha Wickrematunge also caused Plaintiff Ahimsa Wickrematunge

severe pain and suffering and emotional distress. As a result, Plaintiff has been damaged in an amount to be proven at trial.

70     In addition, Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
*(Crimes Against Humanity)*

71     Plaintiff Ahimsa Wickrematunge, in her capacity as the legal representative of the estate of Lasantha Wickrematunge, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 to 70 as if fully set forth herein.

72     While serving as Secretary of Defense, Defendant, his subordinates and individuals acting in coordination with government security forces targeted journalists and media workers within the civilian population perceived to be critical of government policies or officials. Journalists and media workers were systematically arrested and detained, and many were tortured and killed, for their reporting, including the Decedent.

73     This attack against civilian journalists and media workers was widespread, as found by the United Nations investigation on Sri Lanka, and the

crimes were met with persistent impunity. As indicated in paragraph 15, the attack against Lasantha was committed in the context of a larger campaign of violence in the final stages of the civil war, during which up to 40,000 civilians may have been killed. A report by the Committee to Protect Journalists ranked Sri Lanka among the top ten countries with the highest rate of impunity for killings of journalists during the relevant time period. The U.S. State Department's annual human rights reporting during the relevant period also criticized the government – and in particular, the Ministry of Defense – for its harassment of journalists through threats and intimidation.

74    This attack was also systematic. All of the acts described herein deliberately targeted civilian journalists and media workers perceived to be critical of government policies or officials, including the Defendant. As detailed in paragraphs 23 to 31, many of the attacks, including that against the Decedent, exhibited a high degree of planning and coordination.

75    The extrajudicial killing of Decedent was committed as part of this widespread or systematic attack against a civilian population. Decedent was also subject to persecution on the basis of his perceived political opposition to Defendant and the Rajapaksa government.

76     The murder and persecution of Decedent constitute crimes against humanity, a "tort . . . committed in violation of the laws of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350. The crimes against humanity of extrajudicial killing and of persecution on the basis of political affiliation, committed as part of a widespread or systematic attack against a civilian population, violates customary international law as widely reflected, clearly defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

77     Defendant possessed the requisite knowledge that his conduct was in furtherance of an attack on a civilian population. As alleged in paragraphs 54 to 59, Defendant exercised command responsibility over, conspired with, aided and abetted, directed and/or incited his subordinates in the Sri Lankan security forces and military intelligence, or groups acting in coordination with these units, to engage in widespread or systematic targeting of journalists and media workers that were perceived to be critical of the government, including the extrajudicial killing and persecution of Decedent on political grounds.

78     Defendant's acts described herein, and the acts committed by his associates, directly and proximately caused Plaintiff and Decedent severe pain and

suffering. As a result of these crimes against humanity, Plaintiff, in her individual capacity, and as a representative of the estate of Decedent Lasantha Wickrematunge, has suffered damages in an amount to be determined at trial.

79     In addition, Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court to

(a)     enter judgment in favor of the Plaintiff on all counts of the Complaint according   to proof;

(b)     award compensatory and punitive damages according to proof;

(c)     grant reasonable attorneys' fees, costs, and expenses according to proof;

(d)     grant the Plaintiff equitable relief including, but not limited to, an injunction prohibiting Defendant from interfering with any criminal investigations involving the murder of Lasantha Wickrematunge in Sri Lanka; and

1

(e)  such other and further relief as the court may deem just and proper.

2

3

A jury trial is demanded on all issues so triable.

4

5

6

Dated: April 4, 2019

7

8

9

10

*Attorneys for Plaintiff Ahimsa Wickrematunge*

11

12

s/ Paul Hoffman

13

Paul Hoffman

14

Schonbrun Seplow Harris & Hofman LLP

15

200 Pier Ave., Ste 226
Hermosa Beach, CA 90254

16

hoffpaul@aol.com

17

310-717-7373

18

CENTER FOR JUSTICE & ACCOUNTABILITY

19

Nushin Sarkarati

20

nsarkarati@cja.org
Carmen Cheung (pro hac vice pending)

21

ccheung@cja.org

22

One Hallidie Plaza, Suite 406
San Francisco, CA 94102

23

(415) 544-0444 (telephone)

24

25

26

27

28